<u>CORRECTED</u>

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ANNE PEMBER. | Case No.: 3:02 CR 380 (AHN)<br><br><br>January 23, 2007 |

## <u>SENTENCING MEMORANDUM OF ANNE PEMBER</u>

Helen Gredd (ct24506)
Daniel E. Reynolds (ct24507)
Lauren Freundlich (ct24508)
LANKLER SIFFERT & WOHL LLP
500 Fifth Avenue, 33rd Floor
New York, New York 10110
(212) 921-8399

-and-

Alfred U. Pavlis (ct08603)
DALY & PAVLIS LLC
107 John Street
Southport, CT 06490
(203) 255-6700

Attorneys for Anne Pember

# TABLE OF CONTENTS

Factual background ................................................................................... 1

    A.  The extraordinary nature and extent
        of Ms. Pember's assistance to the government ................................. 2

    B.  The extraordinary toll that Ms. Pember's
        assistance has taken upon her and upon her family ......................... 5

Argument ............................................................................................... 11

Point I  A sentence of probation coupled with community service tailored to
      Ms. Pember's skills and experiences would be both just and appropriate. ........ 11

    A.  Under the totality of circumstances presented by
        this case, a sentence of probation is appropriate .......................... 13

        1.  The extraordinary nature of Ms. Pember's cooperation..................... 13

        2.  The mitigating circumstances relating
            to Ms. Pember's role in the offense...................................... 14

        3.  The unduly harsh impact that a sentence involving
            confinement would have upon the Pember family.............................. 18

            a) Health and other family issues ....................................... 18

            b) Impact upon Ms. Pember's ability to teach .................................. 19

    B.  Ms. Pember's offer to perform community service confirms
        the appropriateness of a sentence of probation and provides
        an additional opportunity for Ms. Pember to make a
        meaningful contribution to society............................................. 22

Point II  There is ample evidence in the record to support findings that would
      expedite Ms. Pember's return to teaching, and we respectfully
      request that the Court consider making such findings ................................... 23

Point III  The Pember family has already
      suffered significant financial penalties........................................ 28

Conclusion ............................................................................................ 29

APPENDIX  Proposal for Community Service

Pursuant to Fed R. Crim. P. 32 and Local Crim. R. 32, we respectfully submit this sentencing memorandum on behalf of Anne Pember, our client of more than eight years.

### Factual Background

When Anne Pember first met with the Government to assist in its investigation of the fraud at CUC (later known as Cendant), the prosecutor who eventually would call her as a witness before this Court was still in law school. Dubbed by *The New York Times* as "the fraud that time forgot,"[1] the Cendant case is well past its eighth anniversary. As a result of defense tactics so extreme that the term "scorched earth" does not begin to do them justice, this case has suffered through years of motion practice – involving literally hundreds of defense applications, most of them extensively briefed and vigorously argued multiple times. The case has also seen a change in venue (again, at the urging of the defense), two reassignments to new judges, and three separate trials – the first of which lasted, once again reflecting the ferocity of the defense as well as the complexity of the subject matter, more than six months.

As the battles raged and the years wore on, Ms. Pember remained true to her commitment to the Government and resolute in her personal determination to do whatever she could to make amends for her participation in the accounting fraud that had occurred at CUC and Cendant. In its motion to the Court, pursuant to § 5K1.1 of the Sentencing Guidelines, the Government characterizes the assistance that Ms. Pember has provided over the past 7-1/2 years as not merely substantial, but extraordinary. And, unfortunately, the toll that Ms. Pember's unprecedented years of service have taken upon her and upon her family is no less extraordinary.

---

[1] Morgenson, "Before Enron, There Was Cendant," *The New York Times,* May 9, 2004, at 31.

### A. The extraordinary nature and extent of Ms. Pember's assistance to the Government[2]

By the Government's own calculation, Ms. Pember earned her entitlement to a 5K1.1 motion fully seven years ago when, as a direct result of her cooperation, the former Chief Financial Officer of CUC abandoned his claim to have been unaware of any fraud at the company and agreed to enter a guilty plea and assist the Government in its continuing investigation.[3] Yet, despite having already earned the Government's support at sentencing, and despite the existence even at that time of other powerful arguments in favor of leniency toward her,[4] Ms. Pember agreed to defer her sentencing and continued to work tirelessly with the Government for the next seven years. In all, over the course of her many years of assistance to the Government, Ms. Pember has met more than 60 times with no fewer than seven different prosecutors and has testified for nearly ten full days at three separate trials.

In the first of those trials, Ms. Pember endured a lengthy cross examination by Kirk Shelton's attorney that is best characterized as harrowing in its abusiveness and degree of personal intrusion.[5] Despite that cross examination – and some would say in no small part as a

---

[2] The description of Ms. Pember's cooperation contained in this memorandum is, we believe, fully confirmed by the motion that is about to be submitted by the Government on Ms. Pember's behalf pursuant to § 5K1.1 of the United States Sentencing Guidelines. Given, however, that the Government's motion will, in keeping with the practice in this District, be submitted under seal, this memorandum does not provide citations to the pertinent portions of the Government's motion.

[3] *See, e.g.,* Gov. Mem. in Opp. To Shelton Mot. For Acquittal and New Trial, May 19, 2005, at 94-96 (arguing that Ms. Pember had no motive to falsely implicate Kirk Shelton because she had already rendered substantial assistance by precipitating Cosmo Corigliano's guilty plea).

[4] As reflected in the stipulations contained in Ms. Pember's plea agreement with the Government, and as further discussed below, those mitigating factors included the nature of Ms. Pember's overall role in the offense – which the Government described as being "supporting rather than … directing" – and the fact that Ms. Pember's actions were not motivated by a desire for personal gain. In addition, and again as further discussed below, Ms. Pember's own contemporaneous actions show that she was anything but comfortable with what she was being asked to do, but was encouraged to soldier on by individuals who did not hesitate to appeal to her sadly misplaced loyalty to those for whom she worked.

[5] By way of example, Mr. Shelton's counsel on more than occasion required Ms. Pember to confirm the fact that her husband suffered from cancer and serious heart disease, attempting – without success – to suggest that Ms. Pember's

2

result of Ms. Pember's admirable response to it – Ms. Pember emerged as a witness whose credibility could not seriously be questioned. By its verdict, the jury made plain that it fully credited Ms. Pember. The Government repeatedly cited Ms. Pember's obvious credibility in its responses to Mr. Shelton's various post-trial motions.[6] Judge Thompson endorsed the Government's assessment of Ms. Pember's credibility in his decisions on Mr. Shelton's post-trial motions.[7] And, most recently, in the trial before this Court, the actions of Mr. Forbes's counsel powerfully confirmed the complete credibility Ms. Pember has commanded as a witness. Ms. Pember was the sole government witness – including both fact and expert witnesses – whom Mr. Forbes's counsel did not attempt to portray as a liar.[8]

Nor, of course, was that because Ms. Pember had nothing to say that was harmful to Mr. Forbes's defense. To the contrary, despite the fact that Ms. Pember did not occupy a position at CUC or Cendant that caused her to have interaction with Mr. Forbes beyond the occasional exchange of pleasantries in the hallway, Ms. Pember's clear and compelling recollection of the one exchange that went beyond an exchange of pleasantries – and her forthright testimony

---

concern for her husband's health had led her to attempt to curry favor with the Government by falsely implicating Kirk Shelton in the fraud at CUC. *See* First Trial Tr. at 3073-81, 3111-31.

[6] *See* Gov. Mem. In Opp. To Shelton Mot. For Acquittal and New Trial, May 19, 2005, at 15, 57, 90, 93-101 (describing the "tell-tale signs of credibility" in Ms. Pember's demeanor and testimony and arguing that because Ms. Pember's testimony was, in and of itself, sufficient to convict Kirk Shelton, the attacks that had been leveled against the credibility of Cosmo Corigliano were ultimately irrelevant); Gov. Mem. In Opp. To Shelton Mot. For Bail Pending Appeal, August 4, 2005, at 10 (same).

[7] *See, e.g.,* Opinion and Order Denying Deft. Shelton's Mot. For Judgment of Acquittal or for a New Trial, August 4, 2005, at 3-4 (denying motion for new trial for reasons set forth in government's opposition papers); Opinion and Order Denying Deft. Shelton's Mot. For Bail Pending Appeal, August 16, 2005, at 5-7 (same); Shelton Sentencing Tr., July 26, 2005 at 486-90, 495-97 (citing Ms. Pember's testimony as a basis for rejecting various sentencing objections by Mr. Shelton, including his objection to an enhancement on the ground that he perjured himself at trial).

[8] In sharp contrast to all other Government witnesses – each of whose testimony was attacked on cross-examination, disputed by Mr. Forbes in his own testimony, and derided by counsel for Mr. Forbes in summation – the testimony provided by Ms. Pember went unchallenged. The cross-examination of Ms. Pember was as mild as it was brief. *See* Third Trial Tr. at 1060–1156. Mr. Forbes, for his part, acknowledged that while he did not recall the interaction described by Ms. Pember, it could well have occurred. *Id.* at 3152-53. And, in summation, Mr. Sullivan did little more than refer to Ms. Pember as a "nice woman" and marvel that she could "come to work every day and do that." Third Trial Tr. at 3491.

regarding the circumstances surrounding that exchange – provided powerful corroboration of the testimony of the Government's other key witnesses.

The reasons for Ms. Pember's effectiveness as a witness are not difficult to understand. She has been direct and plainspoken on the witness stand – and in her many meetings with the Government – both in her description of the fraud that occurred at Cendant and in her acknowledgement of her own participation in that fraud. Ms. Pember also has been meticulous in her efforts to ensure that any statements she makes – whether on or off the witness stand – are as accurate as possible. In fact, as a result of a less than fully successful strategic decision by Mr. Shelton's counsel, that very point was confirmed under oath in the first trial by one of the prosecutors who had worked with Ms. Pember.[9]

The lengthy delays brought on by the seemingly endless stream of defense motions have caused the Government to have to start from scratch with no fewer than three separate trial teams. And, as each of those trial teams has confirmed, Ms. Pember has been unfailingly diligent and of enormous assistance as she has been called upon to re-live and recount in detail, many times over, a chapter in her life of which she is profoundly ashamed.[10]

---

[9] Former Assistant United States Attorney Paul Weissman was called as a witness in the defense case of Kirk Shelton and, in the course of questioning about his recollection of past statements by various of the Government's witnesses, stated with respect to Ms. Pember, "the general memory I have is that Anne Pember was meticulous in telling us which items she thought were falsified and which items she thought were not falsified. And even when she knew that we were interested in hearing …." First Trial Tr. at 11386.

Mr. Weissman was cut off by Mr. Shelton's attorney before he could complete his response, prompting a remarkable exchange between the Court and Mr. Shelton's counsel in which the Court ruled that it would allow counsel to cut off the response as long as the line of questioning was dropped, only to be asked by counsel, "Oh, is this Let's Make a Deal, Judge?" *Id.* That brief excerpt from the first trial provides a telling insight into both the integrity with which Ms. Pember has approached her cooperation with the Government and the abuse she endured at the hands of Mr. Shelton's counsel in the first trial. As might readily be imagined, the treatment Ms. Pember received was exponentially worse than counsel's profoundly contemptuous behavior toward a federal judge.

[10] The depth of Ms. Pember's shame is made plain in a letter she has written to the Court, which we are submitting today to the Probation Office for further transmission to the Court.

Ms. Pember has not merely answered the questions the Government has asked of her. Instead, she has consistently shown herself ready to volunteer any information necessary – whether by correcting unspoken but obvious misimpressions or by pointing the Government to particular documents or witnesses – to ensure that the Government had as accurate an understanding as possible of what occurred at CUC and Cendant.  In addition, for those members of the trial team who were relative newcomers to the world of accounting, Ms. Pember served as an invariably reliable and effective guide to that world.

In short, as the Government itself has already confirmed to this Court, Ms. Pember's assistance to the Government has been not merely substantial, but truly extraordinary.

### B.  The extraordinary toll that Ms. Pember's assistance has taken upon her and upon her family

In addition – and unfortunately – the toll Ms. Pember's assistance has taken is no less extraordinary.  The long delay in Ms. Pember's sentencing – fully seven years beyond the point at which she had first earned entitlement to a 5K1.1 motion and could have reasonably hoped for leniency from the Court – has come at a very high cost to Ms. Pember and her family.

Ms. Pember has been awaiting sentence for more than half of her youngest child's life, and for the entire adolescence of her two older children.  Ms. Pember and her family have also had to battle life-threatening illness – her husband's stage III cancer and subsequent heart disease – while living with the frightening uncertainty of Ms. Pember's own fate.[11]  Moreover, while Ms. Pember has made efforts that are nothing short of heroic to limit the impact of that stress and uncertainty upon her family – a point made poignantly clear in the letters written by family

---

[11] *See, e.g.,* Letters of Anne Pember, Chip Pember, Lucille Pember, Patricia Grob, Angela Carey, Maureen O'Connor, Kathleen Drabaski.  Like Ms. Pember's own letter, the many letters we have received on Ms. Pember's behalf have been submitted to the Probation Office for further transmission to the Court.

5

members and friends on Ms. Pember's behalf[12] – those efforts have added significantly to the

already heavy burdens Ms. Pember herself has borne.  As Ms. Pember's sister Maureen

O'Connor has written, Ms. Pember "was young when all this began, she is not now" – an

observation that bears as much on the toll these years have taken upon Ms. Pember as on the

number of years that have passed.

> Similarly, with equal parts of sadness and admiration, a longtime friend has written:

> I can see that Anne is battle-worn from the past 8 years, yet her
> difficulties and struggles sit very quietly with her.  She has worked
> hard to continue providing support to her family, cooperate with every
> legal authority involved in her case and abide by all the legal requirements
> required of her, and still provide a positive and loving environment for
> her children.[13]

The number of persons who describe the battle-worn Ms. Pember as inspiring is, in fact, nothing

short of remarkable.[14]

> Ms. Pember's fierce defense of her family's well-being has included Herculean efforts –

sandwiched between court appearances and countless meetings with the Government – to ensure

---

[12] *See, e.g.,* Letters of Chip Pember, Lucille Pember, Roxanne Coady, Lori Bumpas, David Pember, Hillary Pember, Joseph Pember, Mary-Lynn Masi, Chuck Masi, Antonia and Todd Nelson, Frank Loh, Elinor Loh, Walter Melfi, Gloria Melfi, Karen Roberts.

[13] Letter of Lori Bumpas.  The warm letter of Ms. Bumpas – who, as director of CUC's marketing systems, reported directly to Ms. Pember for more than three years – also provides a powerful reminder that, even in Ms. Pember's years at CUC, the bulk of her working life had nothing whatsoever to do with the activities that bring her before this Court for sentencing.

[14] *See, e.g.,* Letters of  Roxanne Coady (describing "the breadth of the pain that Anne copes with on a daily basis but never allows to overcome her life" and stating "I am inspired by her."); Patricia Grob ("She inspires by example."); Lucille Pember ("She inspires [her family] to emulate her goodness."); David Pember ("I can honestly say that Anne is our hero.  She is a beautiful person, full of love, compassion, and an eagerness to help."); Iris Pember ("She helped me develop into the woman I am today….More people in the world should have Anne's qualities as a person."); Hillary Pember ("I have only a growing respect for her courage, fortitude and strength of character.  She is an inspiration to me as a mother, a wife and a woman."); Scott and Carolyn Gorton ("Anne is truly an inspiration to her family and friends."); Karen Roberts ("She is an amazing role model to her children and friends….I am honored that Anne Pember counts me among her friends….Few have been tested the way Anne has been, and I admire her character and disposition to go on and grow to become an even better person than the Anne that I met ten years ago."); Helen Alladin ("I cherish Anne's friendship….I ask that you consider in your deliberations the extraordinary qualities that Anne has shared with so many.").

that the special needs of her youngest son, Kyle, were met.  As documented by the information that has been provided to the Probation Department,[15] and as further confirmed by the letters submitted on Ms. Pember's behalf,[16] Kyle suffers from a serious and complex learning disability that has required every available ounce (and then some) of Ms. Pember's skills as an educator and energies as a parent to obtain for Kyle the assistance and accommodations he needs to learn and thrive.  Far from having finished with that battle, Ms. Pember remains in the thick of it as she stands before the Court for sentencing.

The now 47-year-old Ms. Pember – who was her family's sole breadwinner for most of her nine years at CUC and Cendant, and whose husband's ability to contribute to the support of the Pember family has been hindered by serious illness, a limited education, and a lengthy absence from the workforce[17] – has also had to struggle mightily against her own prolonged status in the workforce as felon-awaiting-sentence.  In what was, for Ms. Pember, a particularly painful aspect of that struggle, the long delay of her sentencing caused her to lose an opportunity for employment that not only would have provided her family with at least a modest measure of financial security, but also would have enabled Ms. Pember to contribute significantly to society by serving as a high school mathematics teacher in an underprivileged and underperforming school district.[18]

---

[15] The materials submitted to the Probation Department include medical letters and a detailed chronology prepared by Ms. Pember describing Kyle's condition and the efforts that have been required to ensure that Kyle's needs are met.

[16] *See, e.g.,* Letters of Chip Pember, Lucille Pember, Mary-Lynn Masi, Antonia and Todd Nelson.

[17] *See, e.g.,* Letters of Anne Pember and Chip Pember.

[18] This characterization of the school district is not counsel's, but instead derives from the vivid description that has been provided to the Court by the longtime principal of East Haven High School – Dr. John Smith – in his letter submitted on Ms. Pember's behalf.

In the fall of 2001, having obtained her master's degree in education at night in exchange for working as an unpaid teaching intern during the day, and having been lucky enough to encounter educators who "regarded themselves as being in the second chance business,"[19] Ms. Pember was invited to join the East Haven High School mathematics faculty. And, from the outset, Ms. Pember proved to be a significant asset to the school.[20] The letters before the Court include an impressive collection from Ms. Pember's former colleagues at East Haven, and they are uniform in their praise of Ms. Pember's excellence, enthusiasm and effectiveness as a teacher.[21]

Susan Griffin, for example, who was the team leader for the mathematics department at East Haven for twelve years, and who first met Ms. Pember when Ms. Pember served as a student teacher at East Haven, has written that "[i]t was obvious to those of us who worked with Anne that she was a natural teacher . . . [and she] was strongly encouraged by all of us to apply for an opening as a mathematics teacher." Ms. Griffin's letter goes on to state:

> The following September, Anne accepted an offered position as a mathematics teacher and taught in the classroom next to mine. As a result, I spent a considerable amount of time with Anne professionally and socially during the school day. I mentored Anne and found her to be a dedicated, conscientious and caring teacher. Her main concern each day was the education of her students. She worked hard, reflected upon her performance, and observed others in the quest to improve her teaching strategies. Anne monitored the progress of her students and encouraged them to stay after school for extra help in those areas where they performed below an acceptable level. She encouraged each and every student to strive for a more meaningful education and she was always available to mentor her students. I thought Anne was an exceptionally caring individual and teacher.[22]

---

[19] Letter of John Smith.

[20] *See, e.g.,* Letter of Joseph Marangell.

[21] *See, e.g.,* Letters of John Smith, Patricia Grob, Kathleen Yuse, Joseph Marangell, Susan Griffin.

[22] *See also, e.g.,* Letter of John Smith (former principal of East Haven High School) ("[Anne] impressed colleagues, administrators, students and parents here with her warmth, caring, mastery of the material and classroom

A few months into the school year, however, Ms. Pember was forced to stop teaching when the State of Connecticut declined to certify her because of the charges pending against her – despite the fact that Ms. Pember was strongly supported by the East Haven school superintendent Martin DeFelice and by the high school's principal Dr. John Smith, both of whom had been fully apprised of Ms. Pember's legal status before making the decision to hire her.[23]  In a conference room in Hartford four years ago this month, a member of the review panel that considered Ms. Pember's certification appeal expressed surprise that counsel could not arrange for Ms. Pember to be sentenced, and it was made clear that Ms. Pember's cause was hopeless as long as her criminal case remained pending.  Formal notification of the denial of Ms. Pember's appeal was received shortly thereafter.[24]

Ms. Pember did not – and in fact could not afford to – respond to the Department of Education's decision by remaining idle.  She had a family with an ailing husband in need of support.  By dint of persistence and sheer luck – all of her other employment inquiries having been met with silence – Ms. Pember found employment in a local bookstore, where Ms. Pember continues to work today.  Ms. Pember's work at the bookstore – which, under the circumstances

---

presence….[she] combined the wisdom of midlife with the exuberance of a neophyte…[and] demonstrated a serious commitment to being a mentor for young people as well as helping them demystify mathematics."); Letter of Kathleen Yuse (Business/Technology Team Leader at East Haven High School) ("[Anne's] enthusiasm, creativity, and genuine concern for her students were outstanding.  She consistently demonstrated her conscientiousness and genuine commitment to the education of her students."); Letter of Joseph Marangell (mathematics teacher at East Haven High School who worked with Ms. Pember on an interdisciplinary pilot program for ninth graders) ("Anne was clearly an asset to the school in her brief time there, and laid the foundation for a program which is still operating successfully today….she was truly a professional individual who clearly wanted to do what was best for her students and the school community.").

[23] *See* Letter of John Smith.

[24] Ms. Pember was represented in her appeal by Alfred U. Pavlis of Daly & Pavlis LLC, who also serves as Connecticut counsel in this case.  In addition, the undersigned counsel accompanied Ms. Pember to the review panel's hearing in order to answer, as best we could, any questions pertaining to this case.  Both Mr. Pavlis and the undersigned counsel will be present on the day of Ms. Pember's sentencing and prepared to answer any questions the Court may have about Ms. Pember's certification appeal and subsequent events.

she feels very fortunate to have obtained – entails long and unpredictable hours, for modest pay, and it is anything but secure.  While Ms. Pember has won the strong support of her employer,[25] the business itself – independent bookselling – is a high-risk proposition.

It very much remains Ms. Pember's hope to be able to return to teaching.  Unfortunately, the four years that her case has been further delayed have only added to the obstacles she faces in doing so.  Mr. DeFelice, the superintendent who so strongly supported her original application for certification, has died.[26]  Dr. Smith, the principal who also championed her cause, can do so now only from retirement.[27]  The teachers who were Ms. Pember's colleagues at East Haven have begun to move on to positions at other schools,[28] and they can speak only to their knowledge of the teacher Ms. Pember was four years ago.  In addition, while a staff member in the certification bureau assured Ms. Pember four years ago that her file would be kept open and readily at hand so that her application could be reactivated when her case was concluded, that staff member has stopped responding to inquiries from Ms. Pember and her counsel – either having forgotten who Ms. Pember is, or perhaps having reasonably assumed that so long a delay in bringing this case to conclusion must mean that Ms. Pember's legal situation has worsened with the passage of time.

Ms. Pember's road back to the classroom is, at best, a difficult one, and it could well become impassable.  Ms. Pember cannot hope to obtain her teaching certificate simply by advising the Department of Education that she has, at long last, been sentenced.  Instead, in light of the terms of the most pertinent Connecticut statute, Ms. Pember will have to persuade the

---

[25] *See* Letter of Roxanne Coady.

[26] *See* Letter of John Smith.

[27] *See id.*

[28] *See, e.g.,* Letter of Susan Griffin.

authorities that her application should not be denied on the ground that insufficient time has passed since her "conviction or release," or that there is otherwise insufficient evidence of "rehabilitation."[29]  Whether and when Ms. Pember will be able to meet that burden of persuasion is likely to turn on the sentence she receives from this Court.

**Argument**

**Point I**

**A sentence of probation coupled with community
service tailored to Ms. Pember's skills and
experiences would be both just and appropriate.**

Ms. Pember stands before the Court having, in the words of the Probation Department, "clearly done all she can to accept responsibility and make amends for her mistake."[30]  By virtue of all Ms. Pember has done and endured for more than seven years, she has earned the unqualified and enthusiastic support of not merely one, but three separate teams of Government attorneys and investigators.  By virtue of her determination to support her family and contribute to her community – even while coping with substantial claims on her time by the Government and profoundly serious illness within her family – Ms. Pember has also earned the unqualified and enthusiastic support of those she has worked with in her community for the past seven years.

Ms. Pember's former colleagues at East Haven High School – as well as numerous others with a personal or professional interest in the well-being of children – have urged this Court to

---

[29] Under Connecticut law, a license may not be denied "*solely* because of a prior conviction of a crime," Conn. Gen. Stat. § 46a-80 (emphasis added), but a prior conviction can form the basis for denying a license if:

> after considering (1) the nature of the crime and its relationship to the job for which the person has applied; *(2) information pertaining to the degree of rehabilitation of the convicted person; and (3) the time elapsed since the conviction or release,* the state, or any of its agencies determines that the applicant is not suitable for the position of employment sought or the specific occupation, trade, vocation, profession or business for which the license permit, certificate or registration is sought.

Conn. Gen. Stat. § 46a-80(b) (emphasis added).

[30] Presentence Report for Anne Pember at ¶ 121.

impose a sentence that would enable Ms. Pember to return to the classroom as rapidly as possible. All who know Ms. Pember are fully confident of her potential to make a significant contribution to society as a teacher. Individuals ranging from the former principal of East Haven High School to the former FBI agent responsible for this case have declared that they would regard themselves as fortunate to have Ms. Pember teaching their children and grandchildren. In a case that can fairly be characterized as tragic on many levels, it would be a particular tragedy for Ms. Pember to receive a sentence that would further delay or preclude her return to the classroom. It would also be an unnecessary tragedy.

In recognition of Ms. Pember's extraordinary assistance to the Government over more than seven years, the Government has filed a motion for a downward departure pursuant to § 5K1.1 of the Sentencing Guidelines. In addition, while the Government's motion is – in and of itself – sufficient to authorize a departure from the otherwise applicable guidelines range, the Court also has before it various other factors supporting leniency, at least two of which would themselves be sufficient to constitute an entirely independent basis for departure. One such factor is the extraordinary personal challenges the Pember family has endured and continues to face. Another is that there are significant mitigating circumstances relating to the nature of Ms. Pember's participation in the offense that brings her before the Court before sentencing.[31]

---

[31] As we noted in our response to the initial disclosure of Ms. Pember's presentence report, this Court need not make a separate ruling with respect to each potential basis for departure, *see, e.g., United States v. Borrego,* 388 F.3d 66, 69 (2d Cir. 2004), and we do not seek such rulings. Instead, we simply ask the Court to consider the totality of circumstances relating to Ms. Pember's case, as the Court is both authorized and (in this post-*Booker* era) affirmatively obligated to do in order to fashion a sentence that satisfies the statutory mandate of being "sufficient, but not greater than necessary, to comply" with the fundamental purposes of sentencing. *See, e.g., United States v. Fernandez*, 443 F.3d 19, 32 (2d Cir. 2006) ("The weight to be afforded any given argument made pursuant to one of the § 3553(a) factors is a matter firmly committed to the discretion of the sentencing judge and is beyond our review, as long as the sentence ultimately imposed is reasonable in light of all the circumstances presented."); *United States v. Cornielle,* 171 F.3d 748, 753-54 (2d Cir. 1999) (confirming that district courts are authorized to consider the totality of circumstances in determining the appropriateness and extent of a departure from the otherwise applicable guidelines range).

## A. Under the totality of circumstances presented by this case, a sentence of probation is appropriate.

When the totality of circumstances relating to Ms. Pember are considered, it is clear that a sentence of probation, particularly if accompanied by community service that is tailored to Ms. Pember's skills and experience, would be both just and appropriate. We respectfully urge the Court to impose such a sentence, and to consider coupling it with findings that would increase the likelihood of expediting Ms. Pember's return the classroom.

### 1. The extraordinary nature of Ms. Pember's cooperation

The nature and breadth of the assistance rendered by Ms. Pember in this case is, so far as we have been able to determine, entirely without precedent. Ms. Pember has spent nearly as many years assisting the Government as she spent working at CUC and Cendant, and the amount of time she has spent discussing the inflation of earnings at those companies is vastly greater than the amount of time she spent as a participant in that activity. Over the course of more than seven years, Ms. Pember has consistently made herself available whenever and for however long she was needed. Ms. Pember has pored over roomfuls of documents and has spent hundreds of hours re-treading the same ground over and over again with the Government – both because of the complexity of the relevant facts and accounting principles and because of the shifts in Government personnel that occurred as the years wore on.

As the Government and former members of the Government's three trial teams have confirmed to us, Ms. Pember's assistance was absolutely critical to the Government's efforts to bring to justice those who bore the most responsibility for the accounting fraud that occurred at CUC and Cendant. Ms. Pember's willingness to plead guilty and cooperate with the Government caused the former Chief Financial Officer of CUC to rapidly follow her lead. Ms. Pember was a key Government witness at each of the three trials that have occurred, and it is

13

plain that Ms. Pember's enormous credibility as a witness is the reason why there was only one defendant at the second and third trials.

No other individual in this case did more than Ms. Pember to assist the Government in preparing for each of the trials that occurred. In fact, we believe that no other individual in this case even comes close. Ms. Pember truly stands without equal for her care and diligence in explaining complex fact patterns and difficult accounting principles (as many times and to as many new trial teams as necessary) and for her willingness to work as hard as necessary (even before specific requests were made of her) to find all relevant documents and refresh her recollection about the details of events that occurred long ago.[32]

### 2. The mitigating circumstances relating to Ms. Pember's role in the offense

The nature and circumstances surrounding Ms. Pember's role in the offense provide further support for the imposition of a sentence of probation. As the Government itself has stipulated, and as the trial evidence before this Court has confirmed, Ms. Pember's overall role in

---

[32] We appreciate that Ms. Pember was not among those who "blew the whistle" about what was occurring on the CUC side of Cendant. Under the circumstances, however, the fact that Ms. Pember was not a whistleblower or the "first in the door" should not preclude her from receiving a sentence of probation, nor does that fact militate in favor of any form of confinement as a condition of probation. Ms. Pember's cooperation is measured in years, not months. Indeed, it spans more than seven years and was rendered under the most difficult of personal circumstances. Moreover, Ms. Pember has been, from the first, entirely forthright in her dealings with the Government, as well as prompt in her decision to plead guilty. Ms. Pember's counsel advised the Government of Ms. Pember's willingness to plead guilty within weeks of having been notified that the Government would not include Ms. Pember among those being given immunity and would instead proceed against her.

At this late date, and after all Ms. Pember has done and endured, to punish Ms. Pember for not having "blown the whistle" in 1998 would be profoundly unjust. It would also, arguably, be undesirable from a law enforcement perspective. While society unquestionably has a strong interest in encouraging individuals to report fraudulent conduct, it also has a strong interest in encouraging cooperation even after someone else has stepped forward. If a talismanic importance were to be attached to whistleblowing – to the exclusion of all other relevant circumstances – the Government will find it more difficult in many cases to persuade others to follow those who were "first in the door."

the fraud at Cendant was "supporting" rather than "directing."[33]  In fact, for most of Ms.
Pember's time at the company, her job was entirely divorced from the world of financial
reporting,[34] and her only participation in fraudulent activity while she was the Controller of the
CompuCard division came in response to hurried directions at year-end from CUC's corporate
offices, with no discussion of what had caused those directions to be issued.[35]

Moreover, even after Ms. Pember was promoted in the summer of 1997 to the position of
Controller of CUC, she remained in the role of supporting player in the financial reporting
world.[36]  As the trial evidence before this Court confirmed, Ms. Pember was picked for
promotion to carry out a plan designed by others.[37]  At a time when the impending merger of
CUC and HFS caused the architects of the fraud at CUC to see the need for a plan to hide the

---

[33] Plea Agreement, Schedule A, at ¶ 5.  *See also id.* at ¶ 3 ("taking into account all the circumstances of this case and
the nature of Ms. Pember's role in the offense, the total loss caused by the conspiracy significantly overstates the
seriousness of Ms. Pember's conduct").

[34] *See, e.g.,* First Trial Tr. at 3501, 3504 (Pember) (her work at CompuCard had involved operational accounting and
she was therefore new to the world of financial reporting when she became Controller of CUC); *see also id.* at 2980-
81 (Pember) (even after her promotion to Controller of CUC, she spent some 80 percent of her time on operational
accounting).

[35] *See, e.g.,* First Trial Tr. at 2401-05, 3501-02 (Pember) (describing call in February 1997, shortly after the end of
the fiscal year, in which Cosmo Corigliano and Casper Sabatino told Ms. Pember to use the Ideon merger reserve,
which was carried on the books of CompuCard, to reduce certain operating costs); *see also, e.g.,* First Trial Tr. at
2465-66 (Pember) (describing how "at the end of every year," Mr. Corigliano had Ms. Pember "reduce[e] the
commissions payable account and arbitrarily increase[e] revenue accounts" to "overstate the earnings of Comp-U-
Card").

[36] Although Ms. Pember's promotion made her the nominal supervisor of co-defendant Casper Sabatino, Mr.
Sabatino had been responsible for the company's external financial reporting for twelve years (*see* First Trial Tr. at
4006-09 (Sabatino)), while, as noted above, Ms. Pember was a newcomer to the world of financial reporting – facts
that had caused Mr. Sabatino himself to seek the promotion that was given to Ms. Pember.  *See* First Trial Tr. at
7654 (Corigliano).  Thus, not surprisingly, Ms. Pember's principal interactions with Mr. Sabatino in the relatively
brief time that she served as Controller consisted of familiarizing herself with what Mr. Sabatino did, *see, e.g.,* First
Trial Tr. at 2626-30 (Pember) (describing visit to Mr. Sabatino in which he explained the topside adjustments he
made each quarter at Mr. Corigliano's direction) and attending meetings with Mr. Sabatino at which the two of them
took direction from Cosmo Corigliano or Kirk Shelton.  *See, e.g.,* First Trial Tr. at 2690-93, 2703-04 (Pember)
(describing year-end meeting with Sabatino and Corigliano); 2838-40 (Pember) (describing meeting with Corigliano
and Sabatino re 1998 budget); 2876-80 (Pember) (describing meeting with Sabatino and Shelton re 1998 budget);
4212-15 (Sabatino) (same).

[37] *See, e.g.,* Third Trial Tr. at 3411-12, 3429-49 (summarizing evidence of plan formulated by Walter Forbes and
others to keep the fraud going by, among other things, having Anne Pember in charge of the consolidation).

fraud from HFS,[38] a decision was made to move Ms. Pember from the CompuCard division to

the position of Controller at CUC – a position that had been vacant for two years.[39]

No explanation was given to Ms. Pember for why it had been decided that the position

should no longer remain vacant, and when Ms. Pember learned of the impending merger a short

time later, she was both surprised and concerned that she had been put into what would soon be a

redundant position.[40]  Although not articulated to Ms. Pember at the time, it is more than fair to

infer from the sequence of events reflected in the trial record that Ms. Pember had been picked

for her ability to carry out orders and for her sadly misplaced sense of loyalty to those for whom

she worked.[41]

Certainly, the record before this Court makes clear that those above Ms. Pember did not

hesitate to appeal to her sense of loyalty – and to encourage her to view what she was being

asked to do as reflecting decisions that were properly made by others.  Thus, for example, in her

---

[38] *See id.; see also, e.g.,* Third Trial Tr. at 1657-73 (Corigliano); 1209-21 (Silverman) (merger discussions with HFS were taking place in the spring of 1997 and the merger was publicly announced in May 1997).

[39] *See* First Trial Tr. at 2549-53 (Pember) (position of controller had been vacant since the summer of 1995).

[40] *See* Third Trial Tr. at 902-03 (Pember) ("In the late spring or summer of 1997, I had just been promoted to be the CUC controller and simultaneously or around the same time is when the announcement of a merger was occurring; and I went to Mr. Corigliano and expressed concern to him asking him why he would have promoted me to a position that had been vacant for years and why was he promoting me now when we are in the process of merging with another company."); Tr. at 907-08 (Pember) (Mr. Corigliano responded by telling Ms. Pember "not to worry" and "that he thought the job did make sense").

[41] Most of those who have written to the Court on Ms. Pember's behalf have refrained from attempting to explain a chapter in Ms. Pember's life that she herself finds impossible to satisfactorily account for, but one family member who knows Ms. Pember well has tellingly commented:

Two of Anne's most endearing qualities are the two qualities which I lay blame to her current legal matters.  She is loyal and trusting.  Anne Pember is a rule follower to those she is loyal and trusts.  She has maintained a loyalty and trusting of people but it has sadly been diminished considerabl[y] with the legal ordeal she has had to face.

Letter of Hillary Pember.  Particularly in light of the fact that, as Ms. Pember herself forthrightly acknowledged at trial, she had no expertise whatsoever in financial reporting and did not regard herself as qualified for the job of Controller at CUC, *see* Third Trial Tr. at 903-04, it is fair to conclude that the qualities described by Ms. Pember's sister-in-law were equally evident to Ms. Pember's superiors at CUC and were regarded by them as more important qualifications for this particular job than was expertise in financial reporting.

final weeks at Cendant, when Ms. Pember balked at signing a management representation letter

to Cendant's auditors, she was persuaded to do so through a personal appeal by her longtime

boss.[42]   In addition, Ms. Pember was assured that if there were ever any problems with the

accounting at Cendant, those who would be held responsible for it were the other, much more

senior, signatories to the letter, rather than Ms. Pember.[43]

---

[42] *See* Third Trial Tr. at 1032-34 (Pember) ("Ms. Sattler came with the signature page for the management representation letter, and I looked at Mr. Corigliano and told him that I did not want to sign it.  That I felt it was something I couldn't sign.  I couldn't represent the things that were in the letter.  Mr. Corigliano said please, I would appreciate it if you did.  It's not that big of a deal.  I pointed out to Mr. Corigliano that the only – there was no signature on it yet.  He took the paper from Mary, signed his name, gave it to me, told me it was no big deal, just sign it.  At that time, Mr. Sabatino said I wouldn't sign it.  And Mr. Corigliano said if there's ever a problem, the auditors would pursue Walter, Kirk or myself, who also have to sign the letter, before they ever go after you.  I would really appreciate it if you would sign it.  And I ultimately did.").

Similarly, in testimony given at the first trial about an interaction with a representative of Ernst & Young in early 1998 while she was still Controller of the CompuCard division, Ms. Pember described the uncomfortable feeling of being left with the choice of either lying or contradicting her boss, and admitted that she unfortunately chose the former course.  *See* First Trial Tr. at 2526-30 (Pember) (explaining that she hesitated before answering the auditor's question "[b]ecause I knew if I said – if I answered him accurately, it would have undone the conversations that we had had with the auditors and Mr. Corigliano had been very adamant with the auditors saying it absolutely positively was not operating costs.  And I knew if I answered him incorrectly, I would be lying.").

[43] *See* Third Trial Tr. at 1033-34.  Ironically, while Ms. Pember appears to have been picked by those above her for her strong sense of loyalty and hierarchy, those were the very traits that also set in motion a chain of events that ultimately contributed to the unraveling of the fraud at Cendant.  Once CUC and HFS merged, there was a new hierarchy within Cendant, and Ms. Pember urged those above her on more than one occasion to tell HFS how merger reserves were being used on the CUC side of the company.  (*See, e.g.,* First Trial Tr. at 2929 (Pember); Second Trial Tr. 1392-93 (Corigliano)).  In fact, Ms. Pember's own departure was precipitated by her eventual unwillingness to give HFS yet another false schedule, with Ms. Pember electing instead to tell Mary Sattler to hide outside her office until a visitor from HFS who was seeking a particular universe of information had departed.  (*See* First Trial Tr. at 2915-20 (Pember) (explaining that "[w]e had two choices at that point.  We could either provide the information to [the HFS representative] and he would see how the financials were managed, or we could create some schedule that would have continued the lying and misinformation to New Jersey, and neither one of those seemed to be a very – I'm not sure what word to use – the choices were terrible no matter what way we looked at it.  So rather than ask [Mary] to continue to lie, I asked her to stay outside my office.")).  When HFS-side CEO Henry Silverman learned that his representative had left empty-handed, he demanded that Ms. Pember be relieved from any responsibility for financial reporting.  (*See* Third Trial Tr. at 1021 ("Mr. Corigliano indicated that the gentlemen in HFS were very angry, disappointed in me and that they wanted me to get out of the financial reporting world…[Mr. Corigliano] indicated it was Mr. Silverman who specifically told me to get the blank out of the accounting department")).  And Ms. Pember's impending departure led, in turn, to the March 6 meeting, which – as a result of statements made and a document distributed at Ms. Pember's urging (*see* First Tr. at 2928-33, 2942-48) – led to a heightened level of scrutiny by HFS of the practices of its merger partner and hastened additional departures on the CUC side – events that contributed to the decision of two of Ms. Pember's colleagues to come forward.  (*See., e.g.,* First Trial Tr. at 4480-88 (Sabatino) (describing HFS as conducting an "interrogation" of certain CUC employees after the March 6 meeting and stating that he decided that HFS "needed to know" what was going on); Third Trial Tr. at 2941-45 (Sabatino) (explaining that he decided to report the fraud because "I figured that Mr. Monaco and Mr. Scott Forbes were now going to be the senior financial people at new Cendant and they should have a right to know.")).

Thus, as the Government's own stipulations recognize, and as the Probation Department's assessment confirms,[44] Ms. Pember's offense can fairly be described as having derived from an excessive willingness to respond to appeals to loyalty and to follow directions – even when she knew that the directions were improper ones.  Ms. Pember cannot be counted among those who formulated the directions.

### 3. The unduly harsh impact that a sentence involving confinement would have upon the Pember family

Still another factor supporting the imposition of a sentence of probation is the unduly harsh impact that a sentence involving confinement would have upon the Pember family.

### a) Health and Other Family Issues

By any measure, the Pember family has faced more than its fair share of challenges over the past eight years, and its struggles are far from over.  In addition to the economic and emotional consequences to the Pember family of Ms. Pember's participation in the fraud at CUC and Cendant – consequences that are a continuing source of anguish for Ms. Pember[45] – the Pember family has had to confront illnesses that have threatened the life of Mr. Pember – not once, but twice.  In addition, the Pember family has had to cope with a serious learning disability that has threatened the future of the Pembers' youngest son, as a result of which Ms. Pember has devoted, and continues to devote, substantial efforts toward assuring that her son receives all necessary accommodation and assistance.  Given those hardships – and the importance of Ms. Pember in mitigating their impact – it would be nothing short of cruel at this point to separate Ms. Pember from her family.

---

[44] *See* Presentence Report for Anne Pember at ¶ 118.

[45] *See* Letter of Anne Pember.

Indeed, even a period of home confinement would involve consequences that cannot be justified on the facts of this case. The Pembers do not live in the anonymity of a large city; they live in a small town where the restrictions of home confinement and the wearing of an electronic monitoring device would be impossible to conceal. A condition of home confinement would impair Ms. Pember's ability to be an effective advocate on behalf of her youngest son – a function that requires, among other things, freedom to travel to her son's school for conferences and to be viewed with respect by the educators at that school. It would also impair Ms. Pember's ability to fulfill the responsibilities of her current employment – which involves long and unpredictable hours and considerable interaction with the public. Particularly given all that Ms. Pember has done and endured over her more than seven years of assistance to the Government, she has surely earned the right to ask that her family be spared these additional and unwarranted hardships and humiliations.[46]

### b)  Impact Upon Ms. Pember's Ability to Teach

The imposition of any sentence harsher than probation would also have a profound – and profoundly unfair – impact on the likelihood that Ms. Pember would be able to obtain her certification as a high school teacher any time soon, if ever. As noted above, a provision of Connecticut's general statutes expressly authorizes state licensing authorities to consider the "time that has passed since conviction or release" and whether there is sufficient evidence of "rehabilitation" in deciding whether to grant a license to one who has been convicted of a crime.[47] Particularly given the highly unusual circumstances of Ms. Pember's case, that

---

[46] It also bears note that after the Government has for more than seven years relied upon Ms. Pember's integrity in meeting her obligations to the Government, any condition of probation involving electronic monitoring would be as puzzling as it would be unjust. It would send a signal to the world that Ms. Pember cannot be trusted to act in a law-abiding manner when, in fact, the past 7-1/2 years have demonstrated precisely the opposite.

[47] Conn. Gen. Stat. § 46a-80(b). *See also* note 29 *supra* (providing full text of statutory provision).

statutory provision makes the sentence Ms. Pember receives from this Court of especial importance to her prospects for being able to return to the classroom.

By any fair measure, the "time that has passed since [Ms. Pember's] conviction" should be regarded as extremely substantial – either 6-1/2 or 7-1/2 years, depending upon whether one counts from the point at which Ms. Pember formally entered her plea or the point at which she agreed to do so. And we hope to be in a position to make that argument on Ms. Pember's behalf to the Connecticut Department of Education.

If, however, Ms. Pember receives a sentence that includes some form of confinement – even if it is imposed simply as a condition of probation – then Ms. Pember will be in a position that offers no good alternative. Ms. Pember would have to decide whether to even attempt to somehow persuade the Department of Education that she should be licensed despite the fact that she is still awaiting release – an argument that, particularly given the views expressed by the Department in connection with Ms. Pember's prior application, is likely to be a non-starter. And, if Ms. Pember rejects that alternative and waits until her release, then her application will be delayed even further and she will still be in the unenviable position of having to persuade the Department of Education that she should be licensed despite the fact that she has been only *recently* released.

Neither prospect is, to put it mildly, promising. In fact, given that the imposition of a sentence involving confinement necessarily reflects an assessment that – despite all that Ms. Pember has done and endured over the past 7-1/2 years – she still cannot be regarded as having paid her debt to society, it is more than fair to predict that if such a sentence were to be imposed, Ms. Pember's chances of becoming licensed to teach any time soon are remote to nonexistent.

Under the circumstances of this case, such a result would be profoundly unjust. The fact that imposition of sentence upon Ms. Pember is taking place in the year 2007 is not the result of any delay on her part in accepting responsibility for her conduct. To the contrary, it is precisely *because* Ms. Pember has shown herself willing to "do all she can to accept responsibility and make amends for her mistake"[48] that the resolution of her case has been delayed for more than seven years.

In that regard, it bears emphasis that when Ms. Pember and her counsel appeared before the Department of Education's review panel in January 2003, it was made clear in words of one syllable that unless and until Ms. Pember was sentenced, she had no hope of being certified to teach. Despite that fact – and despite the fact that Ms. Pember could have reasonably hoped even then for substantial leniency from the Court[49] – Ms. Pember did not seek to have her sentencing go forward. Instead, determined to honor her commitment to assist the Government to the best of her ability, and cognizant of the fact that she would be a more effective witness for the Government if her own case remained pending, Ms. Pember agreed to remain in legal limbo.

If Ms. Pember had instead sought to be sentenced in January 2003 – and, particularly given her husband's medical condition, she could not have fairly been criticized for doing so – it is reasonable to predict that she would not today be at risk of being regarded as someone who has yet to be released from punishment for conduct that occurred nearly a decade ago. Even if Ms. Pember had received the maximum sentence of probation, and even if that sentence had included a term of home confinement as a condition of probation, and even if the Department of

---

[48] Presentence Report for Anne Pember at ¶ 121.

[49] By January 2002, Ms. Pember had already provided more than 3-1/2 years of very substantial assistance to the Government, and the mitigating circumstances surrounding her role in the offense were not only fully apparent at that time but documented through stipulations in her plea agreement. In addition, Ms. Pember's husband was, in January 2002, in the midst of chemotherapy for stage III cancer.

Education had required – as we believe it likely would have – that Ms. Pember complete her term of probation before reactivating her application, Ms. Pember still would be in a far better position than she finds herself in today.[50]

### B. Ms. Pember's offer to perform community service confirms the appropriateness of a sentence of probation and provides an additional <u>opportunity for Ms. Pember to make a meaningful contribution to society</u>

Ms. Pember stands ready – and in fact would welcome the opportunity – to perform community service designed to help others from making the mistakes she made at CUC and Cendant. In a written proposal that is appended to this sentencing memorandum, Ms. Pember expresses the hope that she could be of help to students at local business schools or to members of local CPA societies by describing, from personal experience, the ways one can be drawn into criminal conduct in the financial world, and by stressing the importance of "treating each action you take at work as if the decision to do it was yours alone." As Ms. Pember notes, such an address could have a powerful impact on its audience even from its opening moments, as the audience hears a seemingly normal and respectable mother of three state that she used to be a CPA, but is now a convicted felon.

Having already gone through the experience of acknowledging her participation in criminal activity in open court at three separate trials – an experience Ms. Pember has described in her letter to this Court as "shameful each and every time" – Ms. Pember is under no illusions

---

[50] In anticipation of Ms. Pember's sentencing, the undersigned counsel attempted to contact a member of the Department of Education's certification staff in the hope of obtaining at least some informal guidance with respect to whether the Department was, in fact, likely to require Ms. Pember to complete any term of probation imposed before reactivating her application. Unfortunately, as noted above, our call was not returned, and we did not regard it as being in Ms. Pember's interest to risk alienating the certification staff by persisting in efforts to speak with them prior to Ms. Pember's sentencing.

If, as we hope it will, the Court agrees that any sentence harsher than probation would be unwarranted, we also respectfully ask the Court to consider in determining the appropriate length of a term of probation that: 1) Ms. Pember has, in effect, already been serving a particularly arduous form of probation for more than seven years; and 2) there is a real risk that Ms. Pember will not be permitted to reactivate her application until she has completed any term of probation that the Court sees fit to impose.

that the community service she proposes would be anything but painful.  Nonetheless, as Ms.

Pember states in her proposal, she would be glad to have the opportunity to prevent others from

making the same mistakes she did because she "believe[s] that helping others learn from our

mistakes is one of the most important things human beings can do for one another."

   Ms. Pember's offer of community service provides yet another confirmation that a

sentence of probation is an appropriate one for Ms. Pember.  Her offer also promises an

additional means for Ms. Pember to make a meaningful contribution to society.  Particularly for

the latter reason, Ms. Pember would welcome the acceptance of her offer.[51]

### Point II

### There is ample evidence in the record to support findings that would expedite Ms. Pember's return to teaching, and we respectfully request that the Court consider making such findings.

Both federal and state law recognize that there is a powerful societal interest in providing

those who have been convicted of an offense with appropriate opportunities for resuming their

place as productive members of society.  Under federal law, that interest is expressed, *inter alia*,

in 18 U.S.C. § 3553, which lists the fundamental purposes of sentencing and includes among

them "provid[ing] the defendant with needed educational or vocational training."  18 U.S.C. §

3553(a)(2)(D).  Under Connecticut law, society's interest in reintegrating past offenders is

explicitly addressed in Section 46a-79 of the Connecticut General Statutes, which states in

pertinent part:

> The general assembly finds that the public is best protected
> when criminal offenders are rehabilitated and returned to
> society prepared to take their places as productive citizens
> and that the ability of the returned offenders to find

---

[51] We also represent to the Court – and Ms. Pember stands ready to confirm – that Ms. Pember hopes to be able to perform the community service outlined in her letter on an ongoing basis, rather than merely as part of any sentence imposed by the Court.  We respectfully ask the Court to consider that factor as well in determining whether, and for how long, Ms. Pember should be sentenced to probation.

> meaningful employment is directly related to their normal
> functioning in the community.

Unfortunately, as Ms. Pember's employment struggles over the past 7-1/2 years

graphically illustrate, it has been anything but easy for her to find "meaningful employment."

And it is unlikely to become easier any time soon, if ever.  Ms. Pember's days as a CPA and

corporate executive are over.  Ms. Pember has been stripped of her CPA license, and she has

agreed, as part of her settlement with the SEC, to the entry of orders barring her from serving as

an officer or director of a public company and from practicing before the SEC as an accountant.

Moreover, the Pembers do not travel in circles that provide connections to other means of

generating significant income.  As the Court is aware from the letters that have been submitted

upon Ms. Pember's behalf, there are no private venture capitalists among the Pembers' circle of

family and friends.  Instead, that circle consists of teachers, social workers, nurses, small

business owners, and law enforcement officers.

As noted above, it was difficult for Ms. Pember to obtain even so modest a position as

her current job in a local bookstore.  The owner of that bookstore has written to the Court that

she was "concerned about the circumstances" of Ms. Pember's conviction, and that she was not

comfortable hiring Ms. Pember until she had "spent considerable time interviewing people who

knew Anne well," [52] and until Ms. Pember had also been interviewed by the business's lawyer,

accountant, and banker.

If Ms. Pember were to lose her job at that bookstore – a possibility that is anything but

remote given the number of independent booksellers who are shutting their doors – Ms. Pember

would once again find herself looking for work and struggling to overcome the fact that one of

the first things any prospective employer would know about her was that she had a criminal

---

[52] Letter of Roxanne Coady.

24

conviction for fraud.  And, of course, many employers would not need to know any more in order to make a decision about whether to hire Ms. Pember.

As a result, it is clear that Ms. Pember's best hope of being able to "find meaningful employment" that would enable her to provide for her family on a reliable and ongoing basis lies in resuming her efforts to obtain her teaching certification.  We have already urged the Court to impose a sentence that will not unnecessarily hinder those efforts.  In addition, we respectfully ask the Court to consider making findings that would likely expedite Ms. Pember's return to the classroom.

We appreciate that our request is an unusual one.  This case, however, is far from usual.  Moreover, we believe that the Court has before it a record that is more than sufficient to support findings that would be of considerable assistance to the Connecticut Department of Education in their consideration of Ms. Pember's case.  We further believe that providing such assistance would advance one of the recognized purposes of sentencing – namely, ensuring that an individual has received appropriate assistance in resuming her place as a productive member of society.

Accordingly, we respectfully request that when Ms. Pember is sentenced, the Court consider including in the record specific findings that:  1) the activities which resulted in Ms. Pember's conviction ended in 1998; 2) the fact that Ms. Pember has not been sentenced before 2007 is due to the assistance she has been providing the government and accordingly should be regarded as evidence of her rehabilitation; 3) there is nothing in the record before the Court to suggest that Ms. Pember would be unfit to serve as a high school teacher; and 4) the record before the Court is more than sufficient to permit a conclusion that Ms. Pember can be properly regarded as "rehabilitated."

With respect to the lattermost request, we note that the extraordinary assistance Ms. Pember has been providing to the Government since 1999 is, in and of itself, a powerful showing of rehabilitation and good character. In fact, the Government's 5K1.1 motion – which reflects information provided by all those in Government who have worked with Ms. Pember over the past 7-1/2 years – leaves no room for doubt that Ms. Pember can properly be characterized as one who has shown herself to have a profound respect for the law, as well as one who has learned and grown from the mistakes she made ten years ago.

Moreover, the Court also has before it compelling evidence of Ms. Pember's character and current conduct in the form of her own letter to the Court, as well as her proposal for community service, the letters of her friends and family, and many other letters demonstrating that, in addition to assisting the government and tending to the substantial needs of her family for the past 7-1/2 years, Ms. Pember has also consistently conducted herself in the workplace with diligence and integrity.

Ms. Pember's current employer, for example, characterizes her decision to hire Ms. Pember as "one of the best decisions I have made in my professional life" and praises Ms. Pember as "a smart, hard working person of enormous integrity, professionalism and compassion." That employer, Roxanne Coady, also goes on to state:

> I appreciate that Anne has plead guilty to dishonest conduct. My knowledge of her, working next to her for these four years, witnessing the respect she has earned from our staff and the professionals with whom we deal, seeing her cope with the demands of assisting the government and living under the constant stress and uncertainty is dramatically at odds with such dishonest conduct. I have found her to be a woman of uncommon integrity with a fierce commitment to living an honorable life and raising children who will be compassionate productive adults.

Carol Kleinman – a former employee of Ms. Coady's bookstore who reported directly to Ms. Pember for four years – echoes Ms. Coady's assessment, describing Ms. Pember as a "fair

and honest" individual, with whom Ms. Kleinman particularly enjoyed working because they

"shared the same philosophy of never lying."[53]   And Ms. Kleinman ends her letter by stating:

> I did not know Anne Pember prior to [her] joining [our]staff.  However, I
> would like to say that the Anne Pember I worked with is totally honest and
> above-board.  I have heard her speak to her children about morals and values
> and sincerely believe that those talks with them are a reflection of what she
> believes in.

The various letters written by those who worked with Ms. Pember at East Haven High

School provide still further confirmation that Ms. Pember's conduct for the past 7-1/2 years has

been above reproach.[54]   Those letters are uniform in their portrayal of Ms. Pember as a

hardworking, conscientious and eminently reliable colleague.  Indeed, Dr. Smith – the former

principal of East Haven High School, who fought hard to keep Ms. Pember in the classroom and

who remains "unequivocally in support of [Ms. Pember] personally and professionally" –

describes her as "one of the most honorable, conscientious, devoted and talented persons I have

met."  Dr. Smith even goes so far in his letter as to request – *sua sponte* – that the Court

consider:

> including language encouraging the Commissioner of Education
> to reconsider and approve Anne's application for certification to teach
> in the public schools of Connecticut.[55]

We appreciate that the Court is unlikely to regard itself as in a position to make

recommendations to a state Commissioner of Education as to how that Commissioner should

discharge his or her duties.  Accordingly, we have adopted the spirit, but not the form, of Dr.

Smith's request in our own request to the Court on behalf of Ms. Pember.  At the same time,

---

[53] As Ms. Kleinman goes on to explain in her letter, "If I promised payment on a certain date, both Anne and I made sure that the payment was made as promised.  This truly earned us both the respect of the various publishers we dealt with."

[54] *See* Letters of John Smith, Patricia Grob, Kathleen Yuse, Joe Marengell, and Susan Griffin.

[55] Letter of John Smith.

however, we hope that the willingness of Dr. Smith – an educator with more than 36 years experience and direct knowledge of Ms. Pember's talents as a teacher – to make the request that he has made, and the extent to which others have echoed Dr. Smith's hope that Ms. Pember's return to the classroom can be expedited,[56] will be regarded by the Court as confirming the appropriateness of findings that would assist in achieving that goal.

### Point III

### The Pember family has already suffered significant financial penalties.

As the Court is aware from the materials that have been submitted to the Probation Department, the Pember family has already paid a high price for Ms. Pember's participation in the accounting fraud at Cendant, and the current financial situation of the Pember family can fairly be described as precarious.  Moreover, the Pember family's financial condition is about to worsen still further because, as set forth in the materials that have been submitted to the Probation Department, Ms. Pember has reached an agreement with the SEC in which she will surrender $100,000 (as well as all of her remaining options in Cendant-successor companies, which had been purchased by Ms. Pember through Cendant's Bonus and Salary Replacement Program at a cost of approximately $240,000) in settlement of the SEC's claims against her.

In light of those facts, and in light of the Government's stipulation that Ms. Pember's actions were not motivated by a desire to enrich herself personally,[57] we respectfully urge the Court to refrain from imposing further financial penalties upon Ms. Pember.

---

[56] *See, e.g.,* Letters of Susan Griffin, Mary Hurley, Patricia Grob, Kathleen Yuse, Joseph Marangell, Lori Bumpas, Maryanne Lincoln-Hall, Frank Loh, Elinor Loh, Scott and Carolyn Gorton.

[57] Plea Agreement, Schedule A, at ¶ 11.

## **Conclusion**

For the reasons stated, we respectfully request that the Court impose a sentence of probation upon Ms. Pember, with no special conditions other than the performance of community service tailored to her skills and experience.   In addition, we respectfully request that the Court consider making factual findings – for which there is ample support in the record – that would expedite Ms. Pember's return to the classroom.

Respectfully submitted,

LANKLER SIFFERT & WOHL LLP

By: _____

Helen Gredd (ct24506)
Daniel E. Reynolds (ct24507)
Lauren C. Freundlich (ct24508)
500 Fifth Avenue
New York, New York 10110
(212) 921-8399

-and-

Alfred U. Pavlis  (ct08603)
DALY & PAVLIS LLC
107 John Street
Southport, CT 06490
(203) 255-6700

Attorneys for Anne Pember

Dated:  January 23, 2007

**APPENDIX**

Proposal for Community Service

I would welcome the opportunity to speak to individuals pursuing business degrees or professionals in the business community about the mistakes I have made and how to avoid making them.   I believe it would have a powerful impact for me to stand in front of a classroom and introduce myself as an almost 50 year-old woman, with extensive education, over 20 years of professional work experience, at one time a CPA, a respected member of the community, and a wife and mother of three, who is also now a convicted felon.  It would make clear that criminal acts can be committed by those who look and sound very normal and respectable.  It would help individuals understand that even if the person who is asking you to do something seems very normal and respectable, it could still be the case that what you are being asked to do is criminal.

I would be able to discuss, from my own experience, how things that are in fact very wrong can be treated as though they are very normal and "how it is always done."  I would discuss how important it is not to focus on "how it is always done," but rather to have the integrity and confidence in oneself to make sure things are done as they are supposed to be done. I would discuss how agreeing to do things that are aggressive can make it easier to end up doing things that are not just aggressive, but clearly wrong.  I would discuss how agreeing to do things that are "technically" wrong, but for which you hear excuses, can make it easier to end up doing things that that have absolutely no excuse.  I would discuss how important it is not to think of yourself simply as a team player, not to let your job be defined solely by what those above you need or want, but to always ask yourself whether what you are doing is right.  I would discuss the importance of treating each action you take at work as if the decision to do it was yours alone.  I think that many business people, and particularly those in middle management and financial support roles, do not fully appreciate the extent to which they are putting themselves at risk when they go along with decisions that are made by others.   The mistakes I made, and the consequences I have suffered as a result of those mistakes, could be a very powerful learning tool.

Undergraduate and graduate business students would be an appropriate audience for the information I have to share. It would be wonderful to be able to help these students appreciate the importance of making the right choice before they are faced with the possibility of making the wrong one. I can combine the training I received as an educator with my business education and my experience at CUC and Cendant to prepare a presentation that would meet the needs of this audience. In the New Haven community, two schools where business departments might lend themselves to this type of information are Southern Connecticut State University and Gateway Community College.  Coincidentally, I have been at student at both schools. I took a class at Gateway as part of my math credit requirements for my Master's in Education, and I took a class at SCSU to begin a degree in the Department of Educational Leadership. (Although I have been accepted into the Educational Leadership program, I cannot continue unless I begin teaching again.) I would anticipate that being a fellow student would be an additional reason for the students to listen to what I have to say.

Another appropriate venue would be local Societies of Certified Public Accountants. The professionals in that organization might easily face the same sort of choices I did. Describing my

experience and the painful outcome could be a moving presentation that might help them avoid being in the position that I am in today.  I can stress to this group of individuals how hard we all worked to be honored as CPA's and how important it is to not put that – and more – at risk by going along with what is needed to achieve a particular result.

Despite the fact that this would be a painful experience, I would be glad to have the opportunity to help prevent others from making the same mistakes I did. I believe that helping others learn from our mistakes is one of the most important things human beings can do for one another.

Respectfully,

Anne Pember

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused the foregoing Sentencing Memorandum of Anne Pember to be filed electronically and to be served on January 24, 2007 on the following via email:

Craig Carpenito, Esq.
Assistant United States Attorney
United States Attorney's Office
970 Broad Street
Newark, New Jersey  07102
craig.carpenito@usdoj.gov

_____
Daniel E. Reynolds